Opinion issued February 25, 2010



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-00625-CR

———————————

DANIEL LEE SANDIFER, Appellant

V.

THE STATE OF
TEXAS, Appellee



 



 

On Appeal from the 339th District Court

Harris County, Texas



Trial Court Case No. 1021403

 



 

MEMORANDUM OPINION

          Appellant
Daniel Lee Sandifer was convicted by a jury of aggravated sexual assault.  See Tex.
Penal Code Ann. § 22.021(a)(1)(B)(i), (2)(B) (Vernon Supp. 2009).  The jury assessed punishment at 20 years’
imprisonment and a $10,000 fine.  See
Tex. Penal Code Ann. § 22.021(e)
(Vernon Supp. 2009).  In three points of
error, Sandifer contends the evidence is legally and factually insufficient
(points one and two) and he received ineffective assistance of counsel at the
punishment stage (point three). 

We affirm the judgment of the trial
court.

Background

          The
complainant, C.M., was best friends with T.F., who is Sandifer’s stepdaughter.  C.M. visited T.F.’s house often, and Sandifer
was usually there.  C.M. testified that
she felt uncomfortable around Sandifer. 
As examples, C.M. testified that Sandifer insisted that she call him
“Mr. Master, the Magnificent,” that he would spank her, and he would pretend
that he was going to pull her pants down.

          Sandifer
worked at Wal-Mart and sometimes took T.F. and C.M. to work with him.  C.M. testified that in September 2004 when they
accompanied Sandifer to work, he “turned around and he pulled his pants down
and he told us to touch it.”  C.M. said
that Sandifer’s penis was erect, and that she told him “no” and screamed.  After that incident, T.F. asked C.M. to
promise not to say anything.

          C.M.
testified that in October 2004 she was playing at T.F.’s house and Sandifer
asked her to come into his bedroom. 
Sandifer asked C.M. to give him a hug, and when she did, Sandifer pulled
her into his bed and “[h]e put his legs on top of my legs and then he reached
down my shorts, the back of my shorts and reached up and put his finger in my
vagina.”  After C.M. ran away to T.F.’s
bedroom, C.M. testified that Sandifer wrote a note and “slipped it under the
door saying that [T.F.’s mother] doesn’t give him any and we’re the closest
thing he has to a pro -- to a whore.” 
T.F. showed the note to her mother, who burned it.

          On
cross-examination, C.M. stated that she was close to T.F., and C.M. admitted
she “would do pretty much anything [T.F.] asked [her] to do.”  C.M. testified that the police learned about
the incidents at the same time that T.F. moved away from her mother and
Sandifer to live with T.F.’s biological father. 
T.F. was getting disciplined by her mother and Sandifer, and T.F. wanted
to go live with her biological father.

          Pasadena
Police Department Detective T. Brinson testified that he contacted C.M.’s
mother in March 2005 and told her that allegations had been made that C.M. was
a victim of sexual abuse.  C.M.’s mother
brought C.M. to the Children’s Assessment Center to be interviewed by a
forensic specialist.  Detective Brinson
watched the interview of C.M. by closed circuit television, and after hearing
C.M. tell her story, Detective Brinson identified Sandifer as a suspect and
contacted him.  Sandifer denied C.M.’s
allegations of sexual abuse, but he became nervous when Detective Brinson asked
him about a letter he had written. 
Sandifer admitted that he wrote a letter “about being sexually
frustrated and that in the letter he said the [T.F’s mother] would not give him
any and that he did not want to go to a whore to have sex.”

          While
C.M.’s mother was bringing C.M. to the Children’s Assessment Center, C.M. told
her mother what Sandifer had done at Wal-Mart and in Sandifer’s bedroom.  C.M. related the same events to the forensic
interviewer and to a police officer. 
C.M. was also examined by Dr. M. Lyn, who found nothing unusual in her
medical examination of C.M.  C.M. told
Dr. Lyn during the exam that Sandifer touched her in inappropriate ways.  Dr. Lyn testified that the lack of any
physical injury to C.M. at the time of the medical examination, which was
several months after C.M. claimed Sandifer sexually assaulted her, was not
inconsistent with C.M.’s story.

          Sandifer
testified during the guilt-innocence phase of his trial.  In discussing the Wal-Mart incident, Sandifer
stated that T.F. “ran up behind me . . . and just literally jerked on my
shorts.”  Sandifer testified that even
after he pulled up his shorts, T.F. tried to pull them down again and that C.M.
watched the whole incident and laughed.

          Sandifer
said that T.F. and C.M. were often mad at him because he disciplined them.  Sandifer described an incident in which he
was driving with C.M., T.F., and T.F.’s boyfriend, Chris, in the car.  Sandifer said that C.M. became jealous of
T.F. and Chris hugging, and C.M. reacted inappropriately: 

She literally grabbed my hand and pulled it down to her leg and said,
“See, see how soft.”  You know, and you
know, naturally, I’m trying to jerk back my hand.  I did jerk my hand back.  And then she put her arm around me while I’m
driving, trying to put her arm around me and said, “This is my boyfriend.”  I mean, she was just literally mad because of
Chris.

Sandifer testified that C.M. and T.F.
“clowned around” another time by playing a trick on him in his bedroom:

[T.F.] came into the living room where I was watching T.V. and said,
“[C.M.] needs you.  She wants to talk to
you.”  So I walked into the -- the bed is
right there, the door is right there (indicating).  I walked through the door next to the bed and
I said, “What’s wrong,” you know.  [T.F.]
came up behind me and just literally shoved me down on [C.M.].  Okay. 
And [C.M.], she just wraps her legs around me and starts -- you know,
around my neck and holding me down.  And,
you know, I got away, but it was just -- you know, I couldn’t take it.  I didn’t -- you know, I didn’t know what to
think about it.  But she wanted to go get
ice cream.  That was all.  They wanted to go get ice cream.

Sandifer told C.M. and T.F. that this
was inappropriate behavior.

          Sandifer
explained the letter he wrote to C.M. and T.F. by saying that T.F. had told him
that T.F.’s mother had cheated on him during a vacation to California.  He said that T.F. began asking him about
“hookers” and placing notes under his door. 
He denied that he had sex with a prostitute, but he said that he wrote
the note “[t]o get them off my back, to just leave me alone.”

          John
Sandifer, the appellant’s older brother, testified that C.M., T.F., and
appellant attended a birthday party at his house.  At the party, C.M. and T.F. were in a van
with some older boys.  After John’s wife
noticed the smell of marijuana coming from the van, John told the two girls to
get out of the van.  When C.M. and T.F.
refused, John told his brother, who made the girls get out of the van.  John testified that C.M. and T.F. were angry
about the incident.

Analysis

Sufficiency of the evidence

          In
his first point of error, Sandifer contends the evidence is legally
insufficient to establish that he committed aggravated sexual assault for the
following reasons: (1) C.M. never told an adult that Sandifer assaulted her;
(2) C.M. continued to return to Sandifer’s house after the incident; (3)
C.M. did not discuss the incident with three other children who were at the
house at the time; (4) C.M. allowed Sandifer to take her places like
Wal-Mart after the incident; (5) C.M.’s mother testified she had no reason
to believe that Sandifer had done anything inappropriate with C.M.; (6)
Detective Brinson never interviewed one of the other children who was at the
house at the time of the incident; (7) Dr. Lyn testified there was a lack of
any physical injury to C.M.; (8) “Dr. Lyn’ [sic] testimony proves that there
was no specific timing of abuse of [C.M.]”; and (9) the State did not call T.F
as a witness.

          The
standard of review for legal sufficiency of the evidence is whether, viewing
the evidence in the light most favorable to the verdict, any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); King v. State, 29
S.W.3d 556, 562 (Tex. Crim. App. 2000). 
The jury is the exclusive judge of the credibility of witnesses and of
the weight of their testimony.  Margraves
v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).

          Sandifer
does not argue that the State has failed to adduce evidence of any element of
the offense.  Instead, Sandifer argues
that “[d]ue to all the circumstances surrounding this case it is irrational
that a jury could find appellant guilty when the complainant had many instances
to inform someone that she had been sexually abused several times as she
claims.  She did not inform anyone of
significance until she told her mother on February 28, 2005, four to five
months after the alleged abuse.” 
Sandifer’s argument is an attack on the weight and credibility of the
evidence, which is a matter left exclusively to the jury.  See Margraves, 34 S.W.3d at
919.  Accordingly, we hold there is
legally sufficient evidence to support the judgment of conviction and overrule the
first point of error.

          In
the second point of error, Sandifer claims the evidence is factually
insufficient to support his conviction. 
When conducting a factual-sufficiency review, we view all of the
evidence in a neutral light.  Cain v.
State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).  We will set the verdict aside only if (1) the
evidence is so weak that the verdict is clearly wrong and manifestly unjust or
(2) the verdict is against the great weight and preponderance of the
evidence.  Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000). 
Under the first prong of Johnson, we cannot conclude that a
conviction is “clearly wrong” or “manifestly unjust” simply because, on the
quantum of evidence admitted, we would have voted to acquit had we been on the
jury.  Watson v. State, 204 S.W.3d
404, 417 (Tex. Crim. App. 2006).  Under
the second prong of Johnson, we cannot declare that a conflict in the
evidence justifies a new trial simply because we disagree with the jury’s
resolution of that conflict.  Id.  Before finding that evidence is factually
insufficient to support a verdict under the second prong of Johnson, we
must be able to say, with some objective basis in the record, that the great
weight and preponderance of the evidence contradicts the jury’s verdict.  Id.  In conducting a factual-sufficiency review, we
must also discuss the evidence that, according to the appellant, most
undermines the jury’s verdict.  See
Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

          We
may not substitute our judgment for that of the fact-finder.  King, 29 S.W.3d at 563.  The fact-finder alone determines what weight
to place on contradictory testimonial evidence because that determination
depends on the fact-finder’s evaluation of credibility and demeanor.  Cain, 958 S.W.2d at 408–09.  As the judge of the credibility of the
witnesses, the fact-finder may choose to believe all, some, or none of the
testimony presented.  Id. at 407
n.5.  The standard for reviewing the
factual sufficiency of the evidence is whether, after considering all of the
evidence in a neutral light, the jury was rationally justified in finding guilt
beyond reasonable doubt.  Watson,
204 S.W.3d at 415.

          Sandifer
makes the same credibility arguments under his factual-sufficiency claim that
he did with respect to legal sufficiency. 
He claims that in reviewing factual sufficiency, this Court may consider
the credibility of the evidence, but this is not the law.  See Cain, 958 S.W.2d at
408–09.  The only evidence that
contradicts C.M.’s testimony that Sandifer sexually assaulted her is Sandifer’s
denial.  After considering all of the
evidence in a neutral light, we cannot say that the jury’s verdict is against
the great weight and preponderance of the evidence.  Accordingly, we overrule the second point of
error.

Ineffective assistance of counsel

          In
his third point of error, Sandifer claims his trial counsel was ineffective in
failing to offer mitigating evidence to support an argument that the jury should
consider probation as a viable alternative to prison.  Sandifer’s specific complaint is that his
trial counsel did not offer any evidence of sex-offender treatment programs
available outside of the prison system.

To be entitled to a new trial based
on ineffective assistance, a defendant must show that counsel’s performance was
so deficient that he was not functioning as acceptable counsel under the Sixth
Amendment, and there is a reasonable probability that, but for counsel’s error,
the result of the proceedings would have been different.  See Strickland v. Washington,
466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Hernandez v. State, 726
S.W.2d 53, 55–57 (Tex. Crim. App. 1986). 
The defendant bears the burden to prove ineffective assistance of
counsel.  See Strickland,
466 U.S. at 687, 104 S. Ct. at 2064.

          Allegations
of ineffective assistance of counsel must be firmly founded in the record.  McFarland v. State, 928 S.W.2d 482,
500 (Tex. Crim. App. 1996).  The review
of trial counsel’s representation is highly deferential and presumes that
counsel’s actions fell within a wide range of reasonable professional
assistance.  See Thompson v.
State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).  When the record is silent on the motivations
underlying trial counsel’s tactical decisions, the appellant usually cannot
overcome the strong presumption that trial counsel’s conduct was
reasonable.  See Thompson,
9 S.W.3d at 813.

          In most cases, the record on direct
appeal is undeveloped and cannot adequately reflect the motives behind trial
counsel’s actions.  See Mallett
v. State, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).  Because the reasonableness of trial counsel’s
choices often involves facts that do not appear in the appellate record, the
Court of Criminal Appeals has stated that trial counsel should ordinarily be
given an opportunity to explain his or her actions before a court reviews that
record and concludes trial counsel was ineffective.  See Bone v. State, 77 S.W.3d
828, 836 (Tex. Crim. App. 2002).  A
petition for writ of habeas corpus usually is the appropriate vehicle to investigate
ineffective-assistance claims.  See
Mitchell v. State, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).  Without proof from the defendant that there
is no plausible professional reason for trial counsel’s act or omission, the
reviewing court may not speculate on why counsel acted as he did.  See Bone, 77 S.W.3d at 835–36.

          On
appeal, Sandifer argues that his trial counsel failed the first prong of Strickland—i.e.,
counsel’s performance was so deficient that he was not functioning as
acceptable counsel under the Sixth Amendment—because counsel did not offer any
evidence of sex-offender treatment programs available outside of the prison
system during the trial on punishment. 
In making this argument, Sandifer provides no authority for the
proposition that there can be no plausible professional reason for trial
counsel’s act or omission in this specific situation.  (In this regard, we note that Sandifer
maintained his innocence throughout the punishment phase.)  We therefore hold that Sandifer has not met his
burden under the first prong of Strickland to prove that his trial
counsel was deficient.  Because failure
to make the required showing of either deficient performance or sufficient
prejudice defeats an ineffectiveness claim, we do not reach Sandifer’s
arguments on the second prong of Strickland.  See Thompson, 9 S.W.3d at
813.  We overrule the third point of
error.

Conclusion

          We affirm the trial court’s judgment. 

 

 

                                                          Michael
Massengale       
                                                         Justice

 

 

                                                                   

                                                                   

 

Panel
consists of Justices Keyes, Sharp, and Massengale.

Do
not publish.  Tex. R. App. P. 47.2(b).